Jones, J.
(dissenting). We are all in agreement that Logemann’s motion for summary judgment dismissing the first cause of action sounding in strict products liability was properly granted. Our differences arise with respect to the dismissal of the second cause of action alleging negligent failure of Logemann to warn of design defects in the shearing machine that plaintiff was operating when he was injured. In my view the dismissal of this cause of action was proper as well.
I accept the proposition that in some circumstances a servicer of machinery manufactured by another may be liable to the owner or user[1] of machinery if the particular relationship between the servicer and the owner is such as to impose a cognizable duty on the servicer to warn the owner of defects in the design of the machinery of which the servicer has actual knowledge or of which in the exercise of reasonable care he should have knowledge. This *258 liability may arise when the services rendered by the servicer are of such nature and extent as to create a special relation between the servicer and the owner giving rise to a duty on the part of the servicer to warn of such defects (see Restatement, Torts 2d, § 314A), and where the injuries suffered are reasonably foreseeable as a consequence of a failure to give such warning. Evidently, whether in a particular instance the factual aspects of the relationship between the servicer and the owner are such as to give rise to liability of the servicer is a question for determination by the jury, subject, of course, to the obligation of the court to take the question from the jury if the evidence would be insufficient as a matter of law to sustain a verdict for the plaintiff.
I further accept the proposition that, to establish liability on this theory, evidence would be admissible from which it could be found that the owner was aware that the servicer was a commercial successor to the manufacturer as sponsor of the line of products of which the owner’s unit was one and that for that reason the servicer possessed á familiarity and special expertise with respect to maintenance and repair of the unit and evaluation of its possible defects of design.
The determinative issue then, as I see it, is whether the evidence tendered in admissible form on the motion for summary judgment in this instance was sufficient to warrant submission of the pertinent factual questions for jury determination. I am persuaded that the evidence was insufficient to go to a jury and accordingly that the second cause of action was properly dismissed.
The affidavits, including attachments, submitted on the motion show that four years after Wallace Steel and Supply Company had purchased the 300-ton hydraulic shearing machine in question from Richards Shear Company, Inc., Logemann in January, 1968 acquired substantially all the assets of Richards Shear together with the exclusive right to manufacture and sell Richards Shear products, improvements, and inventory and to use the trade name “Richards”.[2] Although Logemann did not continue to man *259 ufacture or sell shearing machines of the model which Wallace Steel had purchased, by letter dated February 16, 1968 individually addressed to Wallace Steel, the general sales manager of Logemann advised that the entire inventories of Richards Shear with blueprints for new equipment and repair parts were stocked by Logemann in Milwaukee “where all new Logemann-Richards shears will be built under one roof, tested and shipped.” The letter also advised that “two fine Richards servicemen” had joined Logemann and would be available for service calls, and concluded, “All of us at Logemann sincerely hope that our acquisition of the Richards Shear line will benefit you”. An employee of Logemann thereafter made a service call on Wallace Steel on July 25, 1968 and described the work done: “Power unit Had a Lot of shock. Reset pilot choke on main Directional Valve. Power unit ok. Runs like a normal 300 TON. Checked Machine in General.” By letter dated April 16, 1976, Logemann advised Wallace Steel that it had entered into a servicing agreement with Philip S. Peterson of St. Paul “for servicing of all Richards Shears” and that Peterson would have the full co-operation of Logemann “in engineering assistance and availability of parts”. Finally, it appears that, on order of Wallace Steel, Logemann supplied undescribed replacement parts “at various times”.
In my opinion this evidence, viewed in the perspective most favorable to plaintiff, is not sufficient to warrant submission of the second cause of action to the jury. There is no more than a tender of evidence from which a jury could find that Logemann was the continuing commercial sponsor of the Richards Shear line of products and accordingly offered a familiarity and special expertise in the repair and servicing of such products. The only contact between Logemann and Wallace Steel in addition to the representation of such successorship and expertise was a single service call six months after Logemann took over the Richards’ deal but nearly 10 years before the accident that resulted in plaintiff’s injuries (Travis v Harris Corp., 565 F2d 443, 449). Sending advice of the Peterson servicing arrangement and the supplying of spare parts, although *260 perhaps not wholly irrelevant to the relationship between Logemann and Wallace Steel, would have little if any probative worth on the issue of LogemamTs duty to warn Wallace Steel of design defects in the shearing machine.
If, on the other hand, there were evidence that the servicing relationship between Logemann and Wallace Steel had been of sufficient substance, whether by reason of the all-embracing nature of the services rendered (as, for instance, if Logemann had been engaged to rebuild the shearing machine [see Restatement, Torts 2d, §§ 403-404]) or by reason of their having continued over an extended period of time (during which Logemann had responsibility for maintenance of the machine) or otherwise, it might be that such evidence would support a finding that the obligations of Logemann included a responsibility to alert Wallace Steel to defects in the design of the 300-ton shearing machine of which Logemann had actual knowledge or in the circumstances in the exercise of reasonable care should have had knowledge. No such evidence, however, was tendered in this instance.
As indicated, I recognize that advertising by a successor commercial sponsor of a product line and aggressive solicitation of servicing orders may contribute to exposing it as servicer to liability to which it would not otherwise be exposed. Nonetheless, to impose liability on anything less than the substantial evidence outlined above or its equivalent, would in my opinion, be to recognize another category of the grounds on which liability could be imposed on a corporate successor with respect to products manufactured by its predecessor — however vociferous might be our verbal disclaimers. It would, of course, be classified as a liability based on negligence rather than a strict products liability. But it would be a liability to which, I suggest, every successor commercial sponsor would almost inevitably be exposed. It can scarcely be imagined that the purchaser of the right to continue sponsorship of any product line worth purchasing would not wish to exploit the good will and know-how acquired from the predecessor and in the solicitation of business prominently represent the fact of such successorship — as did Logemann in this instance. If coupled with that fact all that is needed to expose the *261 successor to liability to the owner or user for design defects in a product manufactured by the predecessor is acceptance of a single service order of any nature from that owner or user, the sweep of the possible liability of a successor sponsor would be very greatly enlarged, beyond any point warranted by the cases in New York. No such holding is cited to us.
In sum, in the fact situation presented in this record, in my view, liability, if any, of Logemann would have to be grounded in its responsibility as a servicer, drawn from its servicing obligations to Wallace Steel, with recognition that its responsibilities in this regard might more readily arise or be of greater scope because of its representation of familiarity and expertise in consequence of having taken over the Richards Shear line. On this analysis the determination of liability, as in any servicing situation, should take into account the holding out by the servicer of special expertise but such holding out, standing alone, would not be a sufficient predicate on which to impose liability.
I also observe that as in other instances of determination of liability for negligence plaintiff here must establish proximate causation. On that issue in this case the lapse of nearly 10 years between the date the services were rendered and the date of the accident would be material.
Finally, I would note my agreement that proper evidence of prevailing industry standards would be admissible as evidence on the issue of whether Logemann had actual knowledge or in the exercise of reasonable care should have known of the design defect which was the cause of plaintiff’s injuries.
Chief Judge Cooke and Judges Wachtler and Meyer concur with Judge Simons; Judges Jasen and Jones dissent and vote to affirm in separate dissenting opinions.
Order modified, with costs to plaintiff, in accordance with the opinion herein and, as so modified, affirmed.

. For present purposes I assume that liability of the servicer, if any, would extend to employees of the owner injured in the course of. their employment. Counsel for Logemann advance no argument based on any distinction between the rights of an owner and those of an employee of the owner.

. There is no tender of proof that Logemann assumed any of the Richards Shear servicing contracts (contrast Leannais v Cincinnati, Inc., 565 F2d 437, 442; Shane v Hobam, Inc., 332 F Supp 526, 530).