# McKenna v. OpenWebs Corporation

*Kevin K. Douglass, Alan B. Rosenthal* and *John J. Edson,* for plaintiff.

*Scott L. Vernick* and *William L. Stang,* for defendant.

FRIEDMAN, *J.,* September 13, 2005—

## INTRODUCTION

The captioned case presents claims based on alternative theories of recovery. According to plaintiff, either there was a de facto merger of defendants OpenWebs and CarParts which renders CarParts liable for OpenWebs' breach of plaintiff's employment contract or, if the facts found by the court do not make out a de facto merger, there is nevertheless ample evidence to support the alternative claim based on CarParts' tortious interference with plaintiff's employment contract with OpenWebs.[1] If the de facto merger claim is well-founded, plaintiff's damages would include an award under the Wage Payment and Collection Law (Wage Act), 43 P.S. §260.1 et seq.; if the only claim made out is tortious interference, then plaintiff's compensatory damages from CarParts would be limited to the failure to pay severance pay, etc. upon OpenWebs' firing plaintiff without cause.[2] CarParts does not dispute plaintiff's calculations

---

1. The other defendants, Woodward and Campbell, are no longer a part of this dispute.

2. See Restatement (Second) of Torts, §774A:

"(1) One who is liable to another for interference with a contract or prospective contractual relationship is liable for damages for

of his damages but limits its opposition to plaintiff's entitlement to any award *from CarParts,* whether based on the conduct of OpenWebs or on CarParts' own conduct.

The court concludes there was a de facto merger of OpenWebs and CarParts. In addition (although this aspect of the decision could be regarded as moot), the court concludes that the credible evidence shows that CarParts tortiously interfered with plaintiff's employment contract with OpenWebs.

## DISCUSSION

The credible evidence shows that CarParts made it a condition of its merger with or acquisition of OpenWebs that plaintiff be fired. The sole reason for this was plaintiff's entitlements under his employment contract with OpenWebs. As a result of CarParts' conduct, OpenWebs' Brad Oberwager fired plaintiff. Mr. Oberwager's testimony that the firing was for other reasons is not at all credible.

Once plaintiff had been fired, CarParts then re-structured the deal with OpenWebs so that it would buy only

"(a) the pecuniary loss of the benefits of the contract or the prospective relation;

"(b) consequential losses for which the interference is a legal cause; and

"(c) emotional distress or actual harm to reputation, if they are reasonably to be expected as a result from the interference.

"(2) In an action for interference with a contract by inducing or causing a third person to break the contract with the other, the fact that the third person is liable for the breach does not affect the amount of damages awardable against the actor; but any damages in fact paid by the third person will reduce the damages actually recoverable on the judgment."

OpenWebs' assets and would assume only certain of OpenWebs' liabilities. In a kind of a belt-and-suspenders approach to doing plaintiff out of his contract benefits, CarParts also significantly reduced the consideration to be paid to OpenWebs' shareholders. The court's recollection of the credible evidence is that CarParts acquired virtually every asset of OpenWebs and assumed all but one of OpenWebs' significant liabilities, that to plaintiff under the employment contract. See the asset purchase agreement, plaintiff exhibit 1, ¶1.6 and schedule 1.6.

There is no doubt that plaintiff's employment contract with OpenWebs was extremely favorable to him. There is no doubt, based on the credible evidence, that plaintiff was worth every penny of that contract. There is no doubt that the contract was fair, reasonable, and beneficial to OpenWebs at the time it was executed. Lastly, there is no doubt that OpenWebs had no "cause" to fire plaintiff. As a result, plaintiff's contract entitles him to damages under the Wage Act from OpenWebs. He is also entitled to damages from CarParts for its tortious interference with his employment contract with OpenWebs. See also, the "Employment agreement with A.J. McKenna," plaintiff exhibit 3, ¶¶4.2, 5.2.

This leaves the issue of whether or not CarParts, as asset purchaser, is also liable for OpenWebs' contract and Wage Act obligation to plaintiff. Ordinarily, as set forth in *Elf Atochem North America v. United States,* 908 F. Supp. 275 (E.D. Pa. 1995),[3] an asset purchaser is not

---

3. In *Elf,* the United States had two roles, as prosecutor under the EPA and as a defendant-owner of DDT manufacturing equipment. 908 F. Supp. at 227 n.2.

liable for the obligations of the asset seller. However, "there are four traditional exceptions to this rule that make a purchaser a successor, and therefore liable [for the seller's obligations]:

"(1) The purchaser expressly or impliedly agrees to assume the seller's obligations;

"(2) the transaction amounts to a consolidation or de facto merger;

"(3) the purchaser is a mere continuation of the seller; or

"(4) the transaction is fraudulent to avoid obligations." *Elf,* 908 F. Supp. at 278.

*Elf,* which was greatly relied on by CarParts, involved the Comprehensive Environmental Response, Compensation and Liability Act of 1980, more commonly known as CERCLA. The dispute concerned the cleanup of a CERCLA Superfund site with contamination dating from 1942. Elf's predecessor, Pennsalt, had purchased the assets of Elko, the original owner of the chemical plant. The question raised was whether or not the business of Pennsalt was a *continuation* of Elko's business. In other words, *Elf* deals with a *different* exception to the general rule than does the instant case. *Elf* has no bearing on the exception asserted in the instant case, a de facto merger of OpenWebs and CarParts.

Plaintiff cites two cases much more on point, *United States v. Keystone Sanitation Co.,* U.S. District Court docket no. CIV.A 1:CV-93-1482, Westlaw citation no. 1996 WL 672891 (M.D. Pa. 1996), and *United States v. Exide Corp.,* US. District Court docket no. CIV.A 00-CV-3057, Westlaw citation no. 2002 WL 319940 (E.D. Pa. 2002). Although both are unpublished memorandum

opinions, which are not usually to be relied on, they are clear and articulate recitations of the applicable law, which is found in *Shane v. Hobam Inc.,* 332 F. Supp. 526 (E.D. Pa. 1971) and *Knapp v. North American Rockwell Corp.,* 506 F.2d 361, 367 (3d Cir. 1974). In both *Keystone* and *Exide,* the court discusses the four exceptions to the general rule regarding non-liability and then focuses on the de facto merger exception. It seems that the Pennsylvania appellate courts have not addressed the de facto merger issue.

Each factor related to the de facto merger exception is quoted from *Exide* then discussed below; all four are present in the instant case, although the *Keystone* court suggests that, "[n]o one of the [four] factors is either necessary or sufficient to finding the existence of [the exception of] a de facto merger." *United States v. Keystone,* slip opinion p. 4.

(1) *"There Is a Continuation of the Enterprise of the Seller Corporation [OpenWebs], So That There Is Continuity of Management, Personnel, Physical Location, Assets, and General Business Operations"*

The credible evidence showed that CarParts bought every asset, assumed almost every unpaid liability, kept most of the key personnel including certain vice presidents, and continued the general business operations of OpenWebs. Although the nature of the business made physical location immaterial, CarParts even stayed at the OpenWebs location for a period of months. CarParts also continues to this day to use the OpenWebs name for at least one of its products or services.

(2) *"There Is a Continuity of Shareholders Which Results From the Purchasing Corporation Paying for the Acquired Assets With Shares of Its Own Stock, This Stock Ultimately Coming To Be Held by the Shareholders of the Seller Corporation So That They Become a Constituent Part of the Purchasing Corporation"*

The shareholders of OpenWebs were given shares in CarParts. The fact that those shares were held in escrow until they became virtually worthless does not affect the validity of this factor. As stated in *Exide,* "under the de facto merger exception, there is no requirement that the seller acquire majority control of any specific percentage of the buyer, only that there be some continuity of shareholder ownership and control. In fact, one court *[Keystone]* has held that a seller acquiring a percentage as small as .0009 percent of the buyer nonetheless supported finding a de facto merger." *Exide,* slip opinion p. 8.

(3) *"The Seller Corporation [Here, OpenWebs] Ceases Its Ordinary Business Operations, Liquidates, and Dissolves As Soon As Legally and Practically Possible"*

Here, the transaction *requires* OpenWebs to "use its best efforts to wind-up, liquidate, dissolve and otherwise dispose of the business." (Asset purchase agreement, ¶4.1.) As in *Exide,* "[t]here is no indication that [OpenWebs] conducted, or had the capacity to conduct, any business as had [OpenWebs] before the transaction." *Exide* (slip opinion at p. 9). Furthermore, the fact that

OpenWebs "formally continues to exist as a shell" does not affect the de facto merger status of the transaction. See *Exide* (slip opinion at p. 9), citing *Knapp.*

**(4)** *"The Purchasing Corporation [CarParts] Assumes Those Obligations of the Seller Ordinarily Necessary for the Uninterrupted Continuation of Normal Business Operations of the Seller Corporation [OpenWebs]"*

The credible evidence shows that CarParts promised to service the OpenWebs contracts for its current customers. See plaintiff exhibit 1, schedule 1.6 (Bates number page D00047).

In summary, even though every one of the four factors need not be present for a de facto merger to have occurred, here, the credible evidence overwhelmingly shows all four are present and just as overwhelmingly supports the conclusion put forward by plaintiff. As a result, again as in *Exide,* "it is not inequitable to hold [CarParts] liable for [OpenWebs debt to plaintiff]." (Slip opinion p. 9.)

This leads us then to the question of what amount does OpenWebs, and therefore CarParts, owe plaintiff. CarParts has not adduced any evidence to suggest that plaintiff's calculations of the OpenWebs contract obligation are incorrect. The court rejects the legal arguments of CarParts related to the validity of the employment contract at issue, the supposed competition by plaintiff with CarParts, the contention that plaintiff's post-termination benefits are an unenforceable penalty, and so forth. There is no credible evidence to support those or any other of CarParts' chief legal positions.

Under the credible evidence, plaintiff is entitled to $3,287,822.97, as set forth in plaintiff exhibit 96, plus reasonable attorneys' fees from OpenWebs under the Pennsylvania Wage Payment and Collection Act 43 Pa.C.S. §260.9a(f). The amount of attorneys' fees will be determined in accordance with the court's usual procedure, set forth in the attached order. Because of the de facto merger of OpenWebs with CarParts, CarParts is liable for this amount as well.

CarParts is also directly liable for its own tortious interference with plaintiff's contract with OpenWebs (since plaintiff was fired and his contract wrongly rejected with the connivance of CarParts). Plaintiff's damages flowing from this tort, while less than those under the Wage Act, are also substantial, being $2,511,258.38 as set forth in plaintiff exhibit 95. However, since this amount is already included in the award under the Wage Act, plaintiff may not recover it again.

As to the counterclaim of CarParts, it is without merit. An award in favor of McKenna must be entered on the counterclaim.

Plaintiff is entitled to an award of $3,287,822.97, plus counsel fees to be determined. See order attached hereto.

## ORDER

And now, to-wit, September 13, 2005, after consideration of the evidence presented and the arguments of counsel, the court having concluded, for the reasons set forth in the attached memorandum in support of order, that plaintiff is entitled to an award of damages in the amount of $3,287,822.97, plus an amount to be determined for reasonable counsel fees, it is hereby ordered

that counsel for plaintiff file an affidavit setting forth the amount of his counsel fees incurred, along with detailed supporting information, including the fee agreement, the hourly rates charged, the number of hours spent, the type of work done, the dates the work was done, attorneys or paralegals by whom the work was done, as well as any other basis for the amount claimed, said affidavit to be filed no later than September 26, 2005.

It is further ordered that defendants respond no later than October 21, 2005, to the affidavit, if they contest the amount claimed, by filing a counter-affidavit, if appropriate, or by demanding an evidentiary hearing as to the amount of fees only. Alternatively, defendants may stipulate to the amount, only, of counsel fees without prejudice to their right to object to the award of any counsel fees.

Once the reasonable amount of plaintiff's counsel fees has been determined, the court will enter its final decision, in accordance with Pa.R.C.P. 1038.